United States District Court
Middle District of Florida
Jacksonville Division

**UNITED STATES OF AMERICA,**
**FOR THE USE AND BENEFIT OF**
**SOUTHERN SITE & UNDERGROUND, INC.,**

   *Plaintiff,*

v.              **NO. 3:14-cv-919-J-PDB**

**MCCARTHY IMPROVEMENT COMPANY &**
**WESTERN SURETY COMPANY,**

   *Defendants.*

---

### Order

  This case involves a dispute about payment for work Southern Site & Underground, Inc. ("SSU"), performed for McCarthy Improvement Company ("McCarthy"). A statement of the case is in the parties' amended joint pretrial statement. Doc. 129 at 1–2.

  Before the Court are **(1)** the defendants' renewed motion for sanctions, Doc. 157, and SSU's response, Doc. 163; **(2)** SSU's motion to exclude Lonnie Rudy Carroll, Jr., as an expert witness, Doc. 93, and the defendants' response, Doc. 108; **(3)** SSU's motion to exclude evidence and argument on its compliance with grading tolerances, including testimony from Ryan Carstensen, Doc. 124, and the defendants' response, Doc. 137; **(4)** the defendants' motion to exclude expert testimony from Lisa and Leslie Mosley, Doc. 142, and SSU's response, Doc. 146; and **(5)** SSU's motion for an order to show cause why McCarthy should not be sanctioned for improperly paying a witness, Doc. 125, and McCarthy's response, Doc. 134.[1]

---

[1]The parties have also filed cross motions on the proper measure of damages, Docs. 153, 156, and the defendants have filed a related motion to exclude testimony

1.      **Defendants' Motion for Sanctions**

The defendants seek sanctions against SSU and its counsel for "significant misconduct" and "repeated misrepresentations" to the defendants and the Court. Doc. 157. They describe the conduct they contend warrants sanctions, including withholding evidence during discovery and disobeying a Court order. Doc. 157. They contend the alleged misconduct has prejudiced them by "denying them access to key documents used by SSU to support its damages within a time frame to allow analysis prior to the filing of motions and taking of depositions" and causing them "to spend additional tens of thousands of dollars both in pursuit of these documents and in analysis of the wrong documents, particularly related to Wenick's calculations." Doc. 157 at 21. They ask the Court to preclude SSU from using evidence or testimony on damages based on anything other than actual costs, strike SSU's expert witnesses, award attorney and expert-witness fees related to the misconduct, strike the complaint or dismiss the action with prejudice, and impose any other appropriate sanction. Doc. 157 at 23.

SSU responds sanctions are unwarranted because it violated no discovery order, the defendants have suffered no prejudice, the defendants ultimately received all necessary documents, the continuance of the trial and opportunity for additional discovery cured any potential prejudice, and no sanction is necessary as punishment or to ensure compliance with future orders. Doc. 163 at 2.

*a.      Background*

*i.      Financial Information and QuickBooks Files*

In March 2015, the defendants issued their first request for production seeking "[a]ll accounting records, cost reports, and budget reports which reference or relate to the Project." Doc. 141-1 at 3. SSU's original counsel responded it would produce

---

from Louis Wenick, SSU's expert. Doc. 152. The Court will address those motions in a separate order.

the requested documents as kept in the usual course of business. Doc. 141-3 at 2. It produced a purported job cost report as a PDF document. Doc. 141-4. After SSU's original counsel withdrew, its new counsel provided amended responses to the first request for production stating SSU would produce the requested documents to the extent it had them. Doc. 141-6 at 2. SSU produced the same report, but this time with Bates labels. Doc. 157 at 5; Doc. 141-4.

The defendants' expert, William Gurry, contends, "A cost report is … typically used as a starting point in claims analysis," and the PDF document produced by SSU is a series of spreadsheets that would be "backup" for a true cost report. Doc. 95-9 at 18. He contends some of the data is incomplete and does not appear to have been created contemporaneously with the project. Doc. 95-9 at 18.

In April 2015, the defendants issued a second request for production seeking financial information including tax returns, balance sheets, profit-and-loss statements, depreciation schedules, and equipment maintenance records. Doc. 50-1 at 4–7. At a hearing on a motion to compel responses to the second request for production, SSU's counsel represented his client had responded it had no tax returns for 2011 to 2013 and no depreciation schedules. Doc. 118 at 50–51. He stated, "[A]s far as I know, these people never took depreciation on their equipment. … [T]hey don't do end-of-year balance sheets. They don't do financial statements because they don't have loans. … There just hasn't been reason for them to create these documents." Doc. 118 at 49. He repeated, "There are no depreciation schedules. … They're not aware of any. If there are any on any tax returns, it's something that they'd have forgotten about by now." Doc. 118 at 51. The Court granted the defendants' motion to compel SSU to produce the requested financial information. Doc. 50 at 4, Doc. 57 at 2–3, Doc. 118 at 55.

After the Court's order, Lisa Mosley emailed her counsel explaining she had asked SSU's accountant "about any depreciation schedules or statements" and "[a]ll he had was a [depreciation] [s]chedule for 2014." Doc. 163-2. She attached some

responsive documents, including the depreciation schedule and some tax returns, and indicated no other responsive documents existed. Doc. 163-2.

In January 2016, SSU produced the depreciation schedule and tax returns. Doc. 157 at 2, Doc. 157-1. Its counsel explained there had been a "miscommunication" between SSU and its accountant regarding the depreciation schedule, and "no records indicating current book value, service maintenance, internally or accountant prepared balance sheets (other than the financial information found as a part of the tax returns), or profit and loss statements" exist. Doc. 157-1.

At Lisa Mosley's February 2016 deposition, she testified SSU uses QuickBooks accounting software. Doc. 67-1 at 34. She testified SSU did not maintain or run job cost reports in the ordinary course of business. Doc. 67-2 at 133, 135. She asserted she had created the document produced as a job cost report using data from QuickBooks for material costs and other costs but not for owned-equipment costs because she does not allocate those in QuickBooks. Doc. 67-2 at 133.

The next day, the defendants issued a request for production of "Quickbooks accounting data file(s) and any other electronic data files in native electronic format covering the period from January 1, 2011[,] through December 31, 2013." Doc. 141-7 at 5. In March 2016, the parties agreed SSU would produce the data if it could segregate the unrelated data files. Doc. 122-4 at 2.

Also in March 2016, the defendants subpoenaed SSU's accounting firm and bonding agent for balance sheets and profit-and-loss statements. Doc. 157-2, Doc. 157-4. Both produced responsive documents. Doc. 157-3; Doc. 157-5. The accountant represented in an email accompanying his production that SSU had provided those documents for tax returns for the past four years. Doc. 157-3 at 1. In an affidavit, he explained he either visits SSU's office or remotely logs in to its computer system to gather necessary information from QuickBooks. Doc. 132 ¶ 5. He represents the financial documents provided were printed in the ordinary course of preparing the tax returns, he adjusts them to create the balance sheets and income statements, and

year-end adjustments may cause discrepancies between the financial documents produced and the final balance sheets attached to the tax returns. Doc. 132 ¶¶ 6, 7. In an undated email,[2] he sent Lisa Mosley balance sheets, income compilation letters, and income statements from 2012 and 2013. Doc. 163-6 at 1. The subject line reads, "Financial statements attached for review." Doc. 163-6 at 1. Lisa Mosley testified she did not recall receiving the email. Doc. 154 at 108–09.

In August 2016, less than a month before the previously scheduled trial date, SSU produced QuickBooks files that, according to a bookkeeper's declaration, show it maintained balance sheets and profit-and-loss statements in the ordinary course of business and had created "memorized reports" to allow printing of that data. Doc. 141-8 ¶¶ 15–16, Doc. 157 at 3, Doc. 157-6. Lisa Mosley confirmed her QuickBooks had memorized reports for profit-and-loss statements that could be run by clicking a button but said she did not run the reports regularly. Doc. 154 at 112–15. She stated the standard reports from QuickBooks would be inaccurate. Doc. 154 at 157–58.

Lisa Mosley testified she entered invoices for job purchases into QuickBooks but did not accurately allocate them to individual projects. Doc. 154 at 19–20. She also entered all of SSU's income and payments but did not always accurately categorize or allocate them. Doc. 154 at 62–64. QuickBooks accurately tracks the gross wages and employment tax paid to each SSU employee. Doc. 154 at 27. It does not accurately track worker's compensation, markup, or vacation pay. Doc. 154 at 28–29, 31–32. To prepare the document originally produced as a job cost report, Lisa Mosley used data on materials and other categories of expenses from QuickBooks, made adjustments based on invoices and receipts, and added other categories of expenses not tracked in QuickBooks. Doc. 154 at 78–92.

The Court granted the defendants' motion to continue the trial to allow sufficient time to review the QuickBooks data and allowed discovery on it. Doc. 145. The Court observed, "Whether in response to the first request for production or follow-

---

[2]The next email in the chain is dated October 19, 2013. Doc. 163-6 at 1.

up communications, the plaintiff should have produced the QuickBooks data well before" it did. Doc. 145 at 2.

After the Court continued the trial, SSU produced additional QuickBooks backup files dated October 9, 2014, including a report titled "Flat Lot—Actual Cost DETAIL (ALL)." Doc. 157 at 6–7; Doc. 157-6; Doc. 157-8. Lisa Mosley testified she might have created the report when responding to discovery requests. Doc. 154 at 121–24. She said she did not produce the report in discovery because it was "incomplete" and "would not include all costs." Doc. 154 at 123–24. She testified the memorized QuickBooks reports would not respond to a request for all accounting records, cost reports, and budget reports because they do not "hold all the costs and they would have been inaccurate and incomplete." Doc. 154 at 130. SSU's accountant stated in an affidavit that SSU's "method of accounting does not require a job cost schedule." Doc. 132 ¶ 8.

ii.    *Wenick's Spreadsheets*

In February 2014, Wenick met with SSU and reviewed project data. Doc. 95-6 at 2. He continued reviewing, cost reports and other project data through May 2014, when he prepared a damage calculation. Doc. 95-6 at 2–8. SSU provided Wenick a spreadsheet prepared by Lisa Mosley containing details of various costs allocated to the project. Doc. 67-2 at 49–50; Doc. 95-1 at 83–87; Doc. 95-2 at 12, 17–19, 82–84, 192; Doc. 95-8; Doc. 154 at 104. She testified she put "everything that [she] had that had to do with the project" into binders and prepared a spreadsheet regarding the equipment and "how it applied to the claim, whether it was extra downtime or so on and so forth." Doc. 67-1 at 134–35. Wenick reviewed the spreadsheet and made modifications and calculations in another spreadsheet. Doc. 95-2 at 12, 19, 24–25; Doc. 95-6 at 7–8; Doc. 154 at 104.

SSU's expert disclosures were originally due in April 2015, Doc. 16, but the deadline was extended into May 2015 after the parties agreed to extend discovery, Doc. 19 (unopposed motion to extend deadlines), Doc. 21 (amended case-management

and scheduling order). SSU did not disclose an expert by the deadline and, in June 2015, the Court granted a joint motion to stay all remaining deadlines for 45 days. Doc. 25 (joint motion) Doc. 26 (order staying case). In August 2015, the Court lifted the stay and, over the defendants' objection, gave SSU a new expert-disclosure deadline in November 2015. Doc. 39. On the deadline, SSU disclosed Wenick as its expert and produced his report. Doc. 95-3; Doc. 95-4. Three days later, the defendants issued a request for production seeking all documents "referenced in SSU's expert report authored by Louis M. Wenick … and/or reviewed or relied upon by the author in preparing the report referenced above." Doc. 163-9 at 4. A few weeks later, the defendants wrote to SSU's counsel to explain it was unclear whether all documents on which Wenick had relied were produced, including "SSU financial data to include accounting data related to the Project, adjustments to financial data, and other financial reports." Doc. 95-7 at 2–3. They asked SSU to provide "any withheld documentation immediately." Doc. 95-7 at 3. SSU responded the proper procedure for seeking information was through interrogatories and requests for production. Doc. 95-7 at 4. It represented Wenick had referenced the cost report and a summary of daily reports provided by SSU, those documents were work product before the expert disclosure, he referenced no other "financial reports," and no responsive documents had been withheld. Doc. 95-7 at 4. The defendants asked SSU to produce the daily report summary and clarify if any other document had not been produced. Doc. 95-7 at 6–7. SSU responded earlier discovery issues made it impossible to determine if specific documents had already been produced but agreed to provide a "duplicate copy" of all of Wenick's documents. Doc. 95-7 at 10.

The following week, SSU sent the defendants a thumb drive that allegedly contained all documents on which Wenick had relied, except for 70 files of documents that could not be duplicated and assertedly had already been produced. Doc. 95-7 at 11, 25. The defendants allege the thumb drive contained Lisa Mosley's spreadsheet

but not Wenick's version.[3] Doc. 157 at 12. SSU does not contend otherwise. *See generally* Doc. 163.

In February 2016, a few weeks before Wenick's deposition, the defendants subpoenaed him for documents not already produced, including documents SSU had provided to him, all materials he had relied on in forming his opinions, all notes or work papers he had prepared in connection with the case, all calculations he had performed or used to reach his conclusions, and his "entire file associated with this matter." Doc. 95-7 at 20. At Wenick's March 2016 deposition, the defendants learned they still did not have Wenick's adjusted spreadsheet.[4] Doc. 95-2 at 24–27; Doc. 95-7 at 23, 25. They asked for it. Doc. 95-7 at 23, 25. SSU's counsel responded Wenick had not understood he needed to provide native files for spreadsheets published in his report and stated it would send missing native files and other documents "in the next few days." Doc. 95-7 at 22. In April 2016, SSU produced Wenick's version, titled "Cost Reports – For Report Adj Dollars." Doc. 95-7 at 31; Doc. 157 at 10, 13.[5]

Gurry and his colleague spent many hours manually keying in data, trying to "correlate the equipment usage from the different documents versus the claim," revising the equipment analysis, and checking and revising the as-built data. Doc. 95-10 ¶¶ 10–13. They did not bill for all of that time. Doc. 95-10 ¶¶ 10, 12. They would

---

[3]The defendants assert they received the spreadsheet on December 30, 2015. Doc. 157 at 8.

[4]At the deposition, Wenick said he had never seen a subpoena requesting documents. Doc. 95-1 at 24–28. SSU's counsel stated he did not remember receiving the subpoena duces tecum and asked if the defendants' counsel was sure he had served it. Doc. 95-1 at 29–30. SSU's counsel remarked the defendants "have a lot of problems with service" and "were leaving people off." Doc. 95-1 at 29.

[5]The defendants provide a purported timeline of events related to Wenick's work. Doc. 157 at 8–10. SSU contends the timeline is incomplete. Doc. 163 at 9. For the sake of brevity, the timeline is not replicated here.

not have spent that time had the spreadsheets been produced earlier. Doc. 95-10 ¶¶ 10, 12.[6]

### b.   *Law and Analysis*

Under Federal Rule of Civil Procedure 26(a), a party must provide an expert witness report for an expert witness who is retained or specially employed to give expert testimony and who the party may use at trial. Fed. R. Civ. P. 26(a)(2). The report must contain:

> **(i)**   a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> **(ii)**   the facts or data considered by the witness in forming them;
>
> **(iii)**   any exhibits that will be used to summarize or support them;
>
> **(iv)**   the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> **(v)**   a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> **(vi)**   a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B)(i)–(vi). The disclosures must be made "at the time and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The disclosure

---

[6]The defendants include a list of "miscellaneous misconduct," including SSU's current counsel's remark that he came to the conclusion alternate cost methods should be used when he was not involved in the original decision, counsel's allegedly false statements that he had not received a subpoena duces tecum for Wenick and the defendants had "100% of the documents" Wenick had, and conflicting statements from Lisa Mosley and SSU's accountant regarding who prepared billing entries in QuickBooks. Doc. 157 at 15–16. They contend that evidence "serves to underscore the point that SSU and its counsel have elected to play games throughout the discovery process and to make misrepresentations to both opposing counsel and the Court, presumably to gain an advantage over the opposition." Doc. 157 at 22–23. While those incidents might be additional evidence of evading cooperative discovery, they are not, by themselves, grounds for sanctions under Rule 37.

requirements are "intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony of other witnesses." *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (internal quotation marks omitted).

Under Rule 26(e), a party must supplement its Rule 26(a) disclosures and other discovery responses as ordered or "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). A party must disclose any additions or changes to an expert witness's report or deposition testimony by the time pretrial disclosures are due. Fed. R. Civ. P. 26(e)(2).

Under Rule 37(c), if a party fails to make or supplement required disclosures or discovery responses, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). A court may also or instead, on motion and after giving an opportunity to be heard, "order payment of the reasonable expenses, including attorney's fees, caused by the failure," "inform the jury of the party's failure," and "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi)." Fed. R. Civ. P. 37(c)(1).

Under Rule 37(b), if a party does not obey an order to provide or permit discovery, the court "may issue further just orders," including:

 **(i)**  directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

 **(ii)**  prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

 **(iii)**  striking pleadings in whole or in part;

   **(iv)**    staying further proceedings until the order is obeyed;

   **(v)**    dismissing the action or proceeding in whole or in part;

   **(vi)**    rendering a default judgment against the disobedient party; or

   **(vii)**    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A)(i)–(vii). Besides or instead of those sanctions, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

Rule 37 gives courts "broad discretion to fashion appropriate sanctions for the violation of discovery orders." *Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536, 1542 (11th Cir. 1993). But dismissal or default judgment should be sanctions of "last resort," imposed only if noncompliance is willful or done in bad faith and lesser sanctions would not suffice. *Id.* Noncompliance due to "simple negligence, misunderstanding, or inability to comply" does not suffice. *Id.* Dismissal is not an abuse of discretion "[w]hen a party demonstrates a flagrant disregard for the court and the discovery process." *Aztec Steel Co. v. Fla. Steel Corp.,* 691 F.2d 480, 481 (11th Cir. 1982).

Excluding otherwise admissible evidence probative of a core issue is inappropriate if it permits a party "to construct, to maintain, and to proffer to the jury a 'fiction.'" *United States v. CMC II LLC,* No. 8:11–cv–1303–T–23TBM, 2016 WL 7665764, at * 1 (M.D. Fla. Dec. 1, 2016) (unpublished). Such a sanction "is warranted, if ever, only in an instance of the most egregious, purposeful, calculated, and otherwise irremediable enormity by a litigant or by counsel or by both and, even then, only if the evidence establishing the enormity and the malevolence that created the enormity is nothing less than distinct and unmistakable." *Id.* Other sanctions,

including a "steep fine against counsel or against the party or against both and disciplinary action against counsel," are preferable. *Id.*[7]

Excluding expert testimony is a "drastic" sanction requiring careful consideration. *See Brooks v. United States*, 837 F.2d 958, 961 (11th Cir. 1988) (court abused discretion by refusing to admit expert testimony because that sanction was too drastic, neither party cited authority in motions, judge gave no reason, and there was no indication court considered less severe sanction); *In re Complaint of Fantome, S.A.*, No. 99-0961-CIV, 2004 WL 5642418, at *1 (S.D. Fla. Dec. 7, 2004) (unpublished) (refusing to impose "extreme remedy" of excluding untimely expert report because movants had report for more than two months before expert's deposition). The non-disclosing party must establish the failure to disclose was substantially justified or harmless. *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 825 (11th Cir. 2009).

Whether failure to make sufficient expert disclosures is substantially justified or harmless depends on many factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1250–51 (M.D. Fla. 2012). Sanctions may be warranted if a delayed disclosure deprives a party of the ability to disclose a rebuttal expert, impairs its ability to effectively cross examine the expert at his deposition, changes the scope of the claims, or is part of a pattern of "last minute filings and disclosures" that "have greatly affected the orderly handling of th[e] case." *See id.* at 1251–52.

---

[7]The defendants rely on a magistrate judge's April 22, 2016, order later vacated in relevant part by the district judge in the order cited here. *See United States v. CMC II, LLC*, No. 8:11-cv-1303-T-23TBM, 2016 WL 3128359 (M.D. Fla. Apr. 22, 2016) (unpublished), *vacated in part by United States v. CMC II LLC*, No. 8:11–cv–1303–T–23TBM, 2016 WL 7665764, at * 1 (M.D. Fla. Dec. 1, 2016) (unpublished); Doc. 157 at 17–18. Because the portion of the order excluding evidence as a sanction was vacated, its reasoning is not persuasive.

A failure to timely make required disclosures might be harmless if substantially similar evidence has already been produced, *see Miele v. Certain Underwriters at Lloyd's of London*, 559 F. App'x 858, 861–62 (11th Cir. 2014) (affirming denial of motion to strike expert's untimely declaration because expert's report was "materially similar" to declaration and contained same conclusions); *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 380 (6th Cir. 2008) (failure to disclose photographs harmless because similar photographs had been disclosed), or if the expert has already been questioned by the opposing party about the information untimely disclosed, *see Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 (8th Cir. 2015) (inclusion of new information in supplemental expert report harmless because expert was questioned extensively about information at deposition); *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167–68 (D.C. Cir. 2007) (alleged failure to disclose expert testimony harmless because subject arose during deposition and testimony was elaboration on expert report); *Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 889 (8th Cir. 2006) (expert's reliance on x-rays not included in report harmless because expert discussed them at deposition).

SSU insists it produced all responsive financial documents it had after ordered to and did not deliberately conceal any. Doc. 163 at 3–6. It contends its accountant had provided no other document and it was unaware any existed. Doc. 163 at 3–6. Giving SSU the benefit of the doubt,[8] sanctions are unwarranted for its response to the defendants' second request for production. If it was unaware the documents existed despite seeking the information from its accountant, it could not be expected to produce them. The defendants obtained the documents in March 2016, well before the trial date. And they have had extra time to analyze them due to the trial continuance.

---

[8]Though an email appears to show SSU's accountant sent Lisa Mosley at least some of the requested documents (balance sheets, an income compilation letter, and income statements for 2012 and 2013), it is undated and does not suffice to show she had those documents or remembered receiving them at the time of SSU's discovery response. *See* Doc. 163-6 at 1.

Failing to disclose spreadsheets on which Wenick relied is more concerning, though not egregious enough to warrant the harshest sanctions. The defendants ultimately received the last spreadsheet in April 2016—five months after the expert-disclosure deadline but five months before the original trial date. Doc. 56; Doc. 61; Doc. 157 at 10. They could adequately prepare for Wenick's and Lisa Mosley's depositions because they received Lisa Mosley's spreadsheet two months before her deposition and two-and-a-half months before Wenick's deposition. The defendants deposed them about the spreadsheet. Doc. 67-2 at 132–38 (Lisa Mosley deposition); Doc. 95-1 at 84–88, 94–95 (Wenick deposition). Wenick also discussed the information he had relied on and the calculations he had made.[9] Though the defendants do not provide copies of the reports for comparison, *see generally* Docs. 157-1–157-8, based on their earlier argument that Wenick's spreadsheet is so similar to Lisa Mosley's as to render Wenick's calculations unreliable for lack of verification, Doc. 152, it appears they were sufficiently similar as to render the additional delay in producing Wenick's report harmless for deposition and trial-preparation purposes. The defendants contend they were prejudiced because their expert would have spent less time analyzing Wenick's report had SSU disclosed both spreadsheets, Doc. 157 at 12–13, but it does not appear this affected the outcome or their ability to adequately prepare for Wenick's deposition and trial.

The defendants have the spreadsheets, their expert has analyzed them, and by trial they will have had at least 10 months to prepare to challenge them through cross examination. Accepting SSU's representations, failing to produce the spreadsheets sooner resulted from disorganization at the beginning of the case, though SSU compounded the error by resisting the defendants' attempts to ensure all responsive documents had been produced. Prohibiting SSU from using Wenick's report and

---

[9]The defendants' counsel questioned Wenick extensively regarding his calculations and the bases for them, including the calculations behind the equipment rates used, Doc. 95-1 at 48–73; the quality-control and production reports, Doc. 95-1 at 88–92; SSU's certified payrolls, Doc. 95-1 at 98; the labor-burden markup, Doc. 95-1 at 100–01; the measured mile analysis, Doc. 95-2 at 38–47; and the small-tools markup, Doc. 95-2 at 48–51.

testimony is unwarranted. But the delay caused the defendants' experts to spend more time (for which the defendants have had to pay more money) than they would have had the spreadsheets been timely disclosed. Under the principle that one side should not pay for the other side's delay, an award of the expenses (including attorney and expert fees) the defendants would not have incurred but for the delay is warranted.

Failing to produce QuickBooks files, particularly the post-trial-continuance production, is most concerning. Though the defendants have now received the documents they sought for nearly two years and have been given extra time to review them, SSU's delays and incomplete productions warrant sanctions (though, again, not the harshest ones).

SSU's QuickBooks files contain financial and other accounting information relating to its costs on the project. *See, e.g.,* Doc. 67-2 at 133 (Lisa Mosley's testimony she relied on data from QuickBooks to compile parts of the document produced as a job cost report). Yet it did not produce them in response to the defendants' first request for production, which asked for "[a]ll accounting records, cost reports, and budget reports which reference or relate to the Project." Doc. 141-1 at 3. And, after the defendants learned of their existence and specifically requested them, it took six months to produce them. Still later, after the court had continued the trial, it produced another responsive document purporting to show actual costs. *See* Docs. 157-6, 157-8.

SSU contends it did not maintain the data for a true job cost report in the ordinary course of business, and points out the "cost report" in the QuickBooks files is titled "cost detail" and does not contain all relevant data. Doc. 163 at 6–9. Regardless of whether the document is complete or incomplete, it should have been disclosed sooner as, at a minimum, accounting information.

SSU argues not all of the alleged misconduct involved a discovery order, so Rule 37 does not apply. Doc. 163 at 16. That argument disregards that Rule 37(c)(1)

allows sanctions for failure to supplement discovery responses, even without a discovery order.

SSU contends the defendants "repeatedly took no action to cure what they now claim were discovery transgressions," and instead "allowed SSU to believe the steps taken by SSU to comply with their requests resolved their concerns." Doc. 163 at 16. To the contrary, the record shows that, when the defendants discovered additional documents might exist, they promptly requested them. *See, e.g.,* Doc. 141-7 at 5.

SSU complains the defendants "waited until the deadline for pretrial motions to raise any of these issues to the Court, with the exception of the lone motion to compel." Doc. 163 at 16. To the contrary, the defendants raised the issue of the missing spreadsheets in their original motion to exclude testimony from Wenick, Doc. 95. The financial information was the subject of a motion to compel, Doc. 44. And, after failing to disclose the QuickBooks data despite having opportunities to do so, the parties agreed regarding their production in March 2016. Any delay on the defendants' part is outweighed by the delay on SSU's part.

The drastic sanctions of striking the pleadings, dismissing the action, entering default judgment, and excluding evidence are unwarranted, particularly given the extra time the defendants have had to examine the newly produced data and analyze its effect on their defenses. But an award of expenses the defendants have incurred due to delayed production is warranted.

The Court **directs** the parties to confer on the amount of but-for expenses. If they cannot agree on an amount without Court intervention, any party may file a motion asking the Court to determine an appropriate amount at any time before the case is closed. The defendants may also cross examine Lisa Mosley about her

discovery delays and failings. The Court will instruct the jurors they may infer whatever they deem warranted from her conduct.[10]

## 2.   SSU's Motion to Exclude Lonnie Rudy Carroll, Jr.

SSU asks the Court to exclude Lonnie Rudy Carroll, Jr., as an expert witness because he produced no expert report, his testimony is unreliable, and he intends to offer inadmissible legal conclusions. Doc. 93.

### a.   *Background*

Carroll began working for McCarthy in January 2015. Doc. 87-1 at 7. He has more than 25 years' experience in the construction industry and has worked on projects involving paving and grading. Doc. 87-1 at 7–12. As the head estimator for McCarthy, his duties include estimating for projects in the southeast, setting up projects, "kickstarting" jobs with project managers, working with operations staff to create change orders, writing contracts and subcontracts, and working on large design-build projects. Doc. 87-1 at 12; Doc. 87-3 at 1. He did not participate in the

---

[10]The defendants suggest SSU should have disclosed Wenick's spreadsheets and the QuickBooks files with their Rule 26(a) initial disclosures. Doc. 157 at 10, 13.

Under Rule 26(a), "a party must, without awaiting a discovery request," provide certain information, including:

> [A] copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses … [and] a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying … the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based[.]

Fed. R. Civ. P. 26(a)(1)(A)(ii)–(iii).

It is unnecessary to decide if SSU should have disclosed any documents under Rule 26(a) because, at a minimum, it should have disclosed them in response to discovery requests.

project here. Doc. 87-1 at 16–17. His duties do not regularly involve giving expert testimony. Doc. 87-3 at 1.

The defendants did not disclose Carroll as a fact witness in their initial disclosures, *see* Doc. 90-1, but disclosed him as an expert witness in January 2016. Doc. 87-3. He is expected to testify on (1) "[t]he typical equipment spread[11] of a contractor performing earth work similar to that of [SSU] on the project at issue in this litigation and whether equipment downtime should be expected based on the typical spread," (2) if "SSU's equipment spread on the project at issue was typical and whether SSU should have expected equipment downtime based on its spread," and (3) "[w]hether SSU's equipment made it possible to efficiently perform its grading work within the tolerances specified in its subcontract with MCI." Doc. 87-3 ¶ 3. He is expected to testify on the following facts and opinions:

> a. In order to efficiently and timely complete the grading and GAB work within SSU's scope of work, SSU should have planned on utilizing more than one motor grader, at least two 434E rollers, and a D5 bulldozer or larger, plus the requisite people to operate this and other equipment required to perform the work.
>
> b. SSU's equipment spread on the project lacked some of the equipment mentioned above which would typically lead to major inefficiencies in SSU's work as well as an extended duration for SSU's work. SSU also lacked the requisite number of operators to complete its work in an efficient or more expedient manner.
>
> c. SSU should have planned and anticipated that its entire equipment spread would need to be present and available during the various phases of its work. SSU should have also planned and anticipated that much of its equipment would be idle because not every piece of equipment would be needed on a daily basis due to the nature of its work.
>
> d. As is standard in the industry, the MCI-SSU subcontract is a fixed price performance contract in which SSU assumes the risk and retains the benefits of cost overruns and underruns in the performance of its work. This type of contract leaves the exact means and methods of

---

[11]"Equipment spread" refers to "the entirety of the equipment" necessary to do the work on a project. Doc. 87-1 at 23.

performing the work, including what equipment SSU utilized, up to SSU.

e. SSU's utilization of a manually guided motor grader to perform its fine grading work on the project made it virtually impossible to grade to within the tolerances of its subcontract with MCI—SSU should have used multiple motor graders with either laser or GPS guided equipment. Even if SSU was able to achieve these tolerances with its one motor grader used on the project at issue, it would have taken at least twice as long and used four times the man hours than what would have been required if it had used either laser or GPS guided equipment.

Doc. 87-3 ¶ 4. He has not produced a report.

At his deposition, Carroll testified he came to his opinion on the overall efficiency of the project by looking "at the schedules provided and then at the equipment that was utilized on the project based [on his] experience of doing work in the similar type materials." Doc. 87-1 at 28. His opinion on the necessary equipment is based on his "previous history of doing a lot of this type of work, that … it is best to have this type of equipment." Doc. 87-1 at 25.

Carroll testified he reviewed none of SSU's costs on the project. Doc. 87-1 at 24. He stated he had not visited the job site but it was "very similar" to a previous project he had performed there around 1989, then later stated conditions had changed and the conditions for this project were not similar to the conditions on the earlier project. Doc. 87-1 at 21, 22–23. He stated he had performed calculations on how long it should have taken SSU to perform work, but he had not written them down and could not testify about them without the information in front of him. Doc. 87-1 at 30–31. He testified SSU had "a lot of equipment that probably was not used hardly at all," based on a two-page list he had been given. Doc. 87-1 at 35. When opposing counsel asked if he knew that list was a list of all the equipment SSU owned, not what was used on the project, he stated he had been told that was what was used on the project and he had not seen the claim document listing the nine pieces of equipment used. Doc. 87-1 at 35–36. When asked, "So you don't even really know what equipment … was out there on the project; is that correct?" he responded, "In

this instant, yes." Doc. 87-1 at 36. When asked if he knew what equipment SSU should have used, he replied, "No, sir," and speculated about possible equipment. Doc. 87-1 at 41–42. He stated he had not read the specifications for this project and agreed he "had no idea" whether this project had the same specifications as most projects, Doc. 87-1 at 37, and had not evaluated how long SSU took to perform any section of work on the project, Doc. 87-1 at 40. He could not remember how many workers SSU had on the project but explained the information came from "talks with the legal counsel" rather than with people involved on the project. Doc. 87-1 at 45–46.

On questioning from the defendants' counsel, Carroll confirmed he was testifying based on his memory rather than documents in front of him, he would need to see the documents to testify in detail, he was unsure whether the list of equipment was all equipment owned by SSU or something else (his counsel said it was the list from SSU's interrogatory answers), and his list of necessary equipment was not exhaustive. Doc. 87-1 at 48–52.

### b.   *Law and Analysis*

### i.   *Expert Report*

SSU argues the Court should exclude Carroll's testimony because he provided no expert report. Doc. 93 at 3–9. The defendants respond he was not required to under the plain language of Rule 26(a)(2)(B). Doc. 108 at 2–4.

Under Rule 26(a)(2)(B), some expert witnesses must provide a report:

> **(B)**   *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i)     a complete statement of all opinions the witness will
        express and the basis and reasons for them;

(ii)    the facts or data considered by the witness in forming
        them;

(iii)   any exhibits that will be used to summarize or support
        them;

(iv)     the witness's qualifications, including a list of all
        publications authored in the previous 10 years;

(v)     a list of all other cases in which, during the previous 4
        years, the witness testified as an expert at trial or by
        deposition; and

(vi)    a statement of the compensation to be paid for the study
        and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

Subsection (C), added in 2010, addresses expert witnesses who are not required
to provide a written report under subsection (B):

(C)     *Witnesses Who Do Not Provide a Written Report*. Unless otherwise
        stipulated or ordered by the court, if the witness is not required
        to provide a written report, this disclosure must state:

(i)     the subject matter on which the witness is expected to
        present evidence under Federal Rule of Evidence 702, 703,
        or 705; and

(ii)    a summary of the facts and opinions to which the witness
        is expected to testify.

Fed. R. Civ. P. 26(a)(2)(C).

The commentary to the 2010 amendments explains subsection (C) was meant
to address requirements for experts who do not have to produce reports and whose
required disclosures are "considerably less extensive than the report required by Rule
26(a)(2)(B)." Fed. R. Civ. P. 26, Advisory Comm. Notes (2010 amend.). It recognizes a
"tension that has sometimes prompted courts to require reports under Rule

26(a)(2)(B) even from witnesses exempted from the report requirement" and clarifies, "An (a)(2)(B) report is required only from an expert described in (a)(2)(B)." *Id.* It further explains:

> A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony. Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C). The (a)(2)(C) disclosure obligation does not include facts unrelated to the expert opinions the witness will present.

*Id.*

Under the plain language of Rule 26(a)(2)(B), Carroll was not required to provide a report because he was not retained or specially employed to provide expert testimony and his duties do not regularly involve giving expert testimony. He must comply only with the disclosure requirements in Rule 26(a)(2)(C). SSU does not contend he has not.

SSU points to *Prieto v. Malgor*, 361 F.3d 1313 (11th Cir. 2004), for the proposition that a witness who offers solely or principally expert testimony must provide an expert report, regardless of whether he is an employee. Doc. 93 at 5. In *Prieto*, the defendants argued their witness did not have to provide an expert-witness disclosure under Rule 26(a)(2)(B) because he was a hybrid witness testifying on both factual and expert matters and was an employee and exempt from the rule. *Id.* at 1318. The Eleventh Circuit observed the witness "had no connection to the specific events underlying th[e] case apart from his preparation for th[e] trial" and "functioned exactly as an expert witness normally does, providing a technical evaluation of evidence he had reviewed in preparation for trial." *Id.* at 1318–19. The Court agreed with the proposition that "allowing a blanket exception for all employee expert testimony would create a category of expert trial witness for whom no written disclosure is required and should not be permitted" given the rule's "purpose of

22

prompting full pre-trial disclosure of expert information." *Id.* (internal quotation marks omitted). It also agreed that the employees exempt from the rule were limited to experts "testifying as fact witnesses, although they may also express some expert opinions." *Id.*

Though *Prieto* was decided before the 2010 addition of subsection (C), and that addition seems to alleviate the policy concerns behind its holding, one court has observed the 2010 amendment did not explicitly overrule it. *See Allstate Ins. Co. v. Nassiri*, No. 2:08–cv–00369–JCM–GWF, 2011 WL 2975461, at *9 (D. Nev. Jul. 21, 2011) (unpublished) (discussing *Prieto* but declining to apply it in favor of a plain-language approach). And one court has, with little discussion, cited it post-amendment to support the proposition that an expert witness must provide an expert report unless he "has personal knowledge of the facts of the case." *See Logistec USA, Inc. v. Daewoo Int'l Corp.*, No. CV 213–027, 2014 WL 5025794, at *6 (S.D. Ga. Sept. 30, 2014) (unpublished) (internal quotation marks omitted).

Given the 2010 amendment, *Prieto* does not require Carroll to comply with Rule 26(a)(2)(B) report requirement. The Court does not find the post-amendment case applying it persuasive because it contained no analysis and the plain language of the Rule weighs against applying it here. Its plain language requires only certain expert witnesses to comply with the more detailed expert-report requirements of Rule 26(a)(2)(B); all others must comply with the less detailed disclosure requirements of Rule 26(a)(2)(C). That plain-language reading is bolstered by the commentary to the amendment, explaining, "An (a)(2)(B) report is required only from an expert described in [the Rule]."[12]

---

[12]The other pre-amendment cases SSU cites are unpersuasive for the same reason. *See* Doc. 93 at 3–7.

Because Carroll was not required to comply with the expert-report requirements of Rule 26(a)(2)(B), exclusion of his opinions on that ground is unwarranted.

*ii.     Reliability*

SSU argues the Court should exclude Carroll's testimony because it is insufficiently reliable. Doc. 93 at 9–15. It contends his testimony is unreliable because it is based on insufficient facts about SSU's performance on the project and primarily, if not solely, on his experience without an explanation of how that experience led to his opinions or the methods he used. *Id*. at 12–15.

The defendants respond experience is the best indicator of reliability in Carroll's profession, he applied his extensive experience to review of the project documents, he was confused about what documents were referenced at the deposition because it was conducted by telephone, and his lack of knowledge about SSU's performance on the project does not matter because he intends to testify only on what SSU should have expected based on the equipment and number of workers it used, not what happened on the project. Doc. 108 at 4–6.

Under Federal Rule of Evidence 702,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)**     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)**     the testimony is based on sufficient facts or data;

**(c)**     the testimony is the product of reliable principles and methods; and

**(d)**     the expert has reliably applied the principles and methods to the facts of the case.

A court must act as a gatekeeper and ensure expert testimony is reliable and relevant before admitting it as evidence. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). In performing the gatekeeping function, a court "must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable …; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291–92 (11th Cir. 2005). The proponent of the testimony must establish those elements by a preponderance of the evidence. *Id.* at 1292. That burden does not require "proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

A court has broad discretion in deciding whether to admit or exclude expert testimony, *Evans v. Mathis Funeral Home,* 996 F.2d 266, 268 (11th Cir. 1993), but must focus "solely on principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595. "It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; s*ee also Allison*, 184 F.3d at 1311. ("The gatekeeper role … is not intended to supplant the adversary system or the role of the jury.").

To determine whether an expert's methodology is reliable, courts consider "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; [and] (4) whether the technique is generally accepted by

the scientific community." *Rink*, 400 F.3d at 1292. Those factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150 (quoted authority omitted). A court has "considerable leeway" when analyzing the reliability of the testimony, *id.* at 152, and may base its decision "upon personal knowledge or experience," *id.* at 150.

The Advisory Committee Notes to Federal Rule of Evidence 702 clarify non-scientific testimony is subject to the same scrutiny as scientific testimony, though it may have to be evaluated "by reference to other standard principles attendant to the particular area of expertise" rather than the scientific method. Fed. R. Evid. 702, Advisory Comm. Notes (2000 amend.). Still, the "trial judge … must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Id.* The testimony "must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.* Experience can form the basis for reliable testimony:

> Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.
>
> …
>
> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable.

*Id.* (internal citation omitted).

For most of the proposed opinions in the expert disclosure, the defendants have not met their burden of showing Carroll's opinions are sufficiently reliable. Though Carroll has many years of experience in the construction industry and appears qualified (SSU does not contend otherwise), he does not explain how his experience is reliably applied to the facts. Some instances of confusion and inability to answer could be explained by his lack of access to documents, *see, e.g.*, Doc. 87-1 at 35–36 (confusion over which equipment list Carroll reviewed), Doc. 87-1 at 49 (clarifying he is not sure which equipment list he viewed and would have to have it in front of him to testify in detail), but he unequivocally stated he did not review the project specifications, did not know if they were similar to those on other projects, and had not visited the project site, though he knew of it from working on another project nearby approximately 25 years ago. Doc. 87-1 at 21, 22, 37. Without knowing the project specifications or current conditions of the jobsite, it is unclear how he can testify on the typical equipment spread for similar work, how SSU's equipment spread compared to the typical spread, if SSU should have expected downtime, and if SSU could have efficiently performed its grading work within the subcontract specifications. His general experience in the construction industry does not explain how he reached his opinions on what SSU should have expected or could have done on *this* project.

Carroll's lack of knowledge of the project resulted in many "opinions" that are actually speculations. *See, e.g.*, Doc. 87-1 at 41–42 (testifying the necessary hauling equipment would be based on the equipment and workers on the job and he did not know what equipment that would be, but he "almost [thought] it would be scrapers"); Doc. 87-1 at 37 (testifying the specifications required the subgrade to be within certain tolerances, but he did not "go back and read the [project] specifications" and got his understanding of them from the fact that "in most specifications the subgrade and base have to be within a certain tolerance based upon the final elevation"). Those speculations, ungrounded in fact and disconnected from a reliable basis, are not reliable opinions.

SSU's motion to exclude Carroll's testimony, Doc. 93, is **granted** to the extent Carroll may not testify on subject areas 3(a)–(c) or topics 4(a), 4(b), 4(c), and some of 4(e). One portion of topic 4(e)—that it would take at least twice as long and quadruple the man hours to complete grading with one motor grader as with laser or GPS-guided equipment—appears reliable. Carroll's experience could logically inform an opinion on the efficiency of equipment in general and does not depend on knowledge of this project. SSU's motion to exclude Carroll's testimony, Doc. 93, is **denied** to the extent he may testify on the efficiency of equipment in general. *See* Doc. 87-3 at 2–3.[13]

### iii.    *Legal Opinion*

SSU argues the proposed opinion in topic 4(d) is a legal opinion inappropriate for expert testimony. Doc. 93 at 15. The defendants respond the expected testimony will not offer a legal opinion but will "expound[ ] on what is a very common type of construction contract and the risks and benefits of using it," and Carroll is qualified to testify on the topic because his job is to evaluate risks and price them accordingly. Doc. 108 at 6–7.

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Experts may give opinions on ultimate issues of fact but may not tell the jury what result to reach or testify on the legal implications of conduct. *Montgomery v. Aetna*, 898 F.2d 1537, 1541 (11th Cir. 1990). In other words, experts may not offer legal conclusions. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.,* 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). "[A]n expert witness may not substitute for the court in charging the jury regarding applicable law." *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977).

---

[13]SSU does not challenge Carroll's qualifications or the relevance of his testimony, *see* Doc. 93.

Courts routinely exclude expert testimony that "employs terminology with legal import." *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1325 (M.D. Fla. 2015) (collecting cases excluding testimony opining party was "negligent"). Though expert testimony might be helpful to define technical terms in a contract or the standard of care in the industry, *Nova Cas. Co. v. Waserstein*, No. 04-20755-CIV, 2005 WL 5955694, at *2 (S.D. Fla. Sept. 7, 2005) (unpublished), the interpretation of a written contract is a matter of law, *Fid. & Guar. Life Ins. Co. v. Brooks*, 580 F. App'x 781, 783 (11th Cir. 2014). *See also FNB Bank v. Park Nat'l Corp.*, 996 F. Supp. 2d 1187, 1193 (S.D. Ala. 2014) (striking expert testimony that a construction loan agreement required an increase in construction costs to be borne by the developer because it was an interpretation of the contract).

Carroll's opinion on the risks and benefits in the subcontract and what it required SSU to do interprets a contract, which is a legal issue. His opinion on what type of contract is standard in the industry is not. The Court **grants** SSU's motion to exclude Carroll's testimony, Doc. 93, to the extent he may not testify on the risks and benefits of the contract or what it required SSU to do, and **denies** it to the extent he may testify on the type of contract that is standard in the industry.

### 3. SSU's Motion in Limine to Exclude Evidence Regarding Compliance with Grading Tolerances, Including Testimony from Ryan Carstensen

SSU asks the Court to exclude evidence regarding compliance with grading tolerances and any other testimony from Ryan Carstensen because the information is irrelevant, the defendants did not list Carstensen as a fact witness or disclose computations of costs for out-of-tolerance work in Rule 26 disclosures, Carstensen produced no expert report, and Carstensen has not been disclosed as an expert on cost overruns. Doc. 124.

### a. Background

Ryan Carstensen has worked for McCarthy periodically since 1998 and in his current position since April 2015. Doc. 88-1 at 17–18. He is a surveyor and uses

survey equipment, principles, and techniques to perform tasks like concrete paving, asphalt milling, and rock trimming. Doc. 88-1 at 17; Doc. 88-3 ¶ 1. His duties do not involve regularly giving expert testimony. Doc. 88-3 ¶ 2. During the project, he facilitated paving using survey equipment. Doc. 88-1 at 69. SSU included "Ryan [last name presently unknown]," a paving surveyor and grade checker for McCarthy, in its initial disclosures. Doc. 137-1 at 17. The defendants did not list him in their initial disclosures, *see generally* Doc. 124-2, but in January 2016 disclosed him as an expert witness expected to testify on "general surveying practices and grading tolerances," give opinions that certain spreadsheets are accurate, and show SSU did not comply with the tolerances required by the subcontract in some areas of the project. Doc. 88-3 ¶¶ 3, 4.

### b.   *Law and Analysis*

### i.   *Relevance*

SSU argues Carstensen's testimony on SSU's compliance with grading tolerances is irrelevant because McCarthy has not quantified or disclosed any additional cost associated with out-of-tolerance work and McCarthy's certificates of final acceptance confirm SSU's work complied with the contract, specifications, and subcontract. Doc. 124 at 4–7. The defendants respond Carstensen's testimony is relevant because it shows SSU could not meet the subcontract tolerances within the time it stated it needed and McCarthy signed off on noncompliant work at its own expense to keep the project moving. Doc. 137 at 6–8. They contend it is also relevant to refute SSU's measure of damages and to their affirmative defenses of setoff and "the terms and conditions of the written subcontract." Doc. 137 at 7.

Evidence is relevant if "it has a tendency to make a fact more or less probable than it would be without the evidence; and … the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Even if testimony is relevant, a court may exclude it if "its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the

issues, [or] misleading the jury." Fed. R. Evid. 403. But testimony excluded based on those dangers should be limited to "matter[s] of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985).

SSU plans to prove its damages for lost productivity on Lot P-017 using a "measured mile" analysis. Doc. 95-4 at 24; Doc. 99-1 ¶ 9(i); Doc. 106 at 14. A measured-mile analysis compares periods of work when a subcontractor can achieve anticipated or normal productivity, called the "baseline," against the periods during which the subcontractor is affected. *In re Elec. Mach.*, 416 B.R. 801, 853 (M.D. Fla. 2009). Testimony about whether and for which portions of the project SSU met project specifications relates to refuting that measure of damages. It is also relevant to the affirmative defense that "SSU's claims are barred in whole or reduced in part by the doctrine of unclean hands and/or set-off to the extent that SSU has failed to properly perform its work for the Project or has failed to comply with the terms of the subcontract." *See* Doc. 7 at 6 (quoted). Exclusion of the testimony is not warranted on relevance grounds.

### ii.   *Failure to Disclose Under Rule 26(a)*

SSU argues the Court should exclude Carstensen's testimony because he intends to offer fact testimony, and the defendants did not disclose him in their initial disclosures. Doc. 124 at 13–14. The defendants concede they did not because of an "oversight at the beginning of the case" but assert the omission was harmless and does not warrant exclusion because SSU already knew he knew of the case and had listed him as a witness on its initial disclosures, they timely disclosed him as an expert witness, and SSU deposed him. Doc. 137 at 3–4.

A failure to timely make required disclosures might be harmless if the opposing party listed the undisclosed witness in its own disclosures and the opposing party deposed the witness on the issues about which he intends to testify. *See Rodriguez v. Estero Fire Rescue*, 2:13-cv-452-FtM-29CM, 2014 WL 3908165, at *3 (M.D. Fla. Aug.

31

11, 2014) (unpublished) (belated disclosure of witness harmless and sanctions unwarranted because opposing party had listed witness in its own disclosures and delayed taking deposition until after discovery deadline); *Burden v. City of Opa Locka*, No. 11–22018–CIV, 2012 WL 4764592, at *7 (S.D. Fla. Oct. 7, 2012) (unpublished) (failure to disclose affidavits during discovery harmless because opposing party listed witnesses in its own disclosures, intended to call them as witnesses, and knew more than two months before the close of discovery opposing counsel intended to call them as witnesses); *Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 (8th Cir. 2015) (inclusion of new information in supplemental expert report harmless because expert was questioned extensively about information at deposition); *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 168 (D.C. Cir. 2007) (alleged failure to disclose expert testimony harmless because subject arose during deposition).

Here, though the defendants should have disclosed Carstensen sooner, they have satisfied their burden of showing the omission was harmless. They disclosed that they intended to call him as an expert witness and his intended testimony on January 22, 2016, two months before the discovery deadline, allowing time for his deposition. *See* Doc. 56, Doc. 88-3. SSU took his deposition and thoroughly questioned him about his knowledge and opinions. *See* Doc. 88-1. SSU's apparent inclusion of Carstensen in its own initial disclosures is not necessarily dispositive because SSU did not know his full identity, but it is pertinent bcause it shows SSU knew he might have information and could not have been surprised by his later appearance in the case. Given SSU's opportunity to depose Carstensen and its inclusion of him in its own disclosure, the defendants' failure to disclose him in their initial disclosures does not justify precluding him from testifying on factual data he gathered during the project.

iii.    *Expert Report*

SSU argues the Court should exclude expert-opinion testimony from Carstensen because he produced no report. Doc. 124 at 6–10. The defendants,

pointing to the post-amendment language of Rule 26(a)(2), contend Carstensen did not have to produce a report because he is an employee of a party whose duties do not normally involve giving expert testimony. Doc. 137 at 5.

SSU's argument here fails for the same reasons it failed regarding Carroll. Carstensen was not required to comply with the expert-report requirements of Rule 26(a)(2)(B), and excluding his testimony on that ground is unwarranted.

### iv.    *Evidence on Extra Costs*

SSU argues the Court should exclude Carstensen's testimony on the extra costs McCarthy incurred on the project because it did not disclose him as an expert on the topic and he has performed no calculations on the issue. Doc. 124 at 14–15. Though Carstensen gave deposition testimony about extra costs McCarthy incurred on the project, Doc. 88-1 at 157–59, the defendants assert he will not testify on the topic at trial. Doc. 137 at 7–8. That follows their disclosure of his testimony, which does not list extra costs as an expected topic. *See* Doc. 88-3.[14]

In a footnote, SSU argues the Court should exclude all evidence of extra costs McCarthy incurred due to SSU's alleged out-of-tolerance work because the defendants disclosed no computation or quantification of extra costs under Rule 26(a). Doc. 124 at 7 n.5. The defendants do not address that argument. *See generally* Doc. 137.

Rule 26(a) requires each party to disclose a computation of each category of damages and make available for copying documents or other evidence on which each computation is based. Fed. R. Civ. P. 26(a)(1)(A)(iii). "Damages" are "money claimed

---

[14]The defendants assert quantifying the setoff amounts requires only "simple math" and need not be quantified by an expert. Doc. 137 at 7–8 & n.5. Because SSU has not challenged the propriety of such evidence from other witnesses, it is unnecessary to address that assertion here.

by, or ordered to be paid to, a person as compensation for loss or injury." BLACK'S LAW DICTIONARY 445 (9th ed. 2009).

Besides the rule, SSU cites no authority to support that the purported extra costs McCarthy incurred due to SSU's noncompliance are "damages." *See generally* Doc. 124. The defendants do not affirmatively claim entitlement to the extra costs, instead discussing them as they relate to additional concrete McCarthy poured to correct SSU's deficiencies and suggesting the "relaxed tolerance requirement" saved SSU money. Doc. 137 at 7. Absent law or argument to support that the defendants' evidence of extra costs qualifies as damages subject to mandatory disclosure requirements, exclusion of evidence of those costs is unwarranted.

The Court **denies** SSU's motion in limine to exclude evidence regarding compliance with grading tolerances, including testimony from Ryan Carstensen, Doc. 124.

### 4. Defendants' Motion to Exclude Expert Testimony from Lisa and Leslie Mosley

The defendants ask the Court to bar Lisa and Leslie Mosley from testifying as experts in SSU's case in chief and limit any rebuttal testimony to the topics disclosed in the rebuttal expert disclosure. Doc. 142.

### a. Background

The Mosleys formed SSU in 1997. Doc. 67-1 at 7–8. Leslie owns the company and prepares estimates for projects, Doc. 64-1 at 6, 10, 15, and Lisa does "office work," including typing proposals and bookkeeping, Doc. 67-1 at 9. SSU did not disclose them in its own expert disclosure but listed them as rebuttal expert witnesses. Doc. 142-1 at 2. It designated them as hybrid witnesses and explained, "To the extent that any portion of the Mosleys' fact testimony regarding the means and methods of performing site preparation, grading, installation of utilities and paving may be

construed as expert testimony, the Mosleys[] are hereby designated as experts for those matters." Doc. 142-1 at 2.

The defendants argue the Court should exclude any expert testimony from the Mosleys during SSU's case in chief because it disclosed them only as rebuttal expert witnesses. Doc. 142. SSU responds the testimony they would offer in its case in chief is not expert testimony because it is testimony based on particularized knowledge they have based on their positions in the business, which is not considered knowledge within the scope of Federal Rule of Evidence 702. Doc. 146.

**b.    *Law and Analysis***

Under Federal Rule of Evidence 701, a lay witness may provide opinion testimony if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." "[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. Ebron*, 683 F.3d 105, 136–37 (5th Cir. 2012) (internal citation and quotation marks omitted). Under Rule 701, a business owner or officer "may provide lay opinion testimony because of the particularized knowledge that the witness has by virtue of his or her position in the business." *United States v. Toll*, 804 F.3d 1344, 1355 (11th Cir. 2015) (internal quotation marks omitted).

Assuming the Mosleys' testimony in SSU's case in chief is based on particularized knowledge they have by virtue of their positions, they may present that testimony as lay witnesses under Rule 701. SSU has not indicated an intent to exceed the scope of the rebuttal expert disclosure. If Lisa or Leslie Mosley testifies on matters outside the scope of Rule 701 or outside the scope of the rebuttal expert disclosure, the defendants may raise an objection then. The Court **denies** the defendants' motion in limine, Doc. 142.

**5.      SSU's Motion for Order to Show Cause**

SSU asks the Court to issue an order to show cause why McCarthy should not be sanctioned for improperly promising Candace Swanson a "lump sum payment of over 2.5 times her weekly salary" for her testimony. Doc. 125 at 7 (internal emphasis omitted). It argues McCarthy's conduct warrants a jury instruction on the impropriety of the payment or an order permitting wide latitude to question Swanson about the payment. Doc. 125 at 3, 8. McCarthy responds sanctions are not appropriate because the payment was reasonable and not contingent on the content of her testimony or the outcome. Doc. 134 at 8–11. It attaches a declaration from Swanson to support its response. Doc. 134-1.

*a.      Background*

Swanson was McCarthy's on-site project manager during the project. Doc. 134-1 ¶ 2. In the early stages of the case, she spent many hours helping McCarthy's attorneys respond to SSU's discovery requests and claims. Doc. 134-1 ¶¶ 5, 6. She was first deposed in May 2015. Doc. 134-1 ¶ 11. In June 2015, she stopped working for McCarthy and started a job closer to home but continued helping with the lawsuit. Doc. 134-1 ¶ 9. In February 2016, after the Court ordered McCarthy to produce a corporate representative for deposition, Doc. 57, she "reluctantly" agreed to fill that role because she knew she was "the person with the most historical personal knowledge of [McCarthy's] dealings with SSU" and it would be a "monumental undertaking" for someone else to prepare for the deposition. Doc. 134-1 ¶¶ 10, 12. She did not want to serve as corporate representative because she did not like having her deposition taken the first time, did not want to take time off her new job to attend a deposition in Atlanta, and did not want to disrupt her family's life for a week. Doc. 134-1 ¶¶ 11, 12. Because she was 26 weeks pregnant at the time of the deposition, she drove instead of flying from Jacksonville to Atlanta for the deposition. Doc. 134-1 ¶ 13. She brought her husband with her so she would not have to drive alone at that stage of pregnancy. Doc. 134-1 ¶ 13.

Swanson initially estimated the following expenses:

    a.      My weekly salary: $1,500+;

    b.      700 miles at $0.54/mile: $378.00

    c.      Meals for me, my husband and child ($100/day x 5 days): $500.00

    d.      Sitter for pets left in Jacksonville ($15/day x 5 days): $75.00

    e.      Husband's loss of business for the week: $550.00

Doc. 134 ¶ 14.

Swanson requested additional money to cover the inconvenience of testifying and expenses she had already incurred for which she had not been reimbursed, for $4000. Doc. 134-1 ¶¶ 14, 15. When she learned her employer would still pay her salary by treating the absence as a paid vacation, she reduced the request to $2500. Doc. 134-1 ¶ 16. Her expenses and her husband's lost income total more than $1500, so she was paid less than $1000 for time "before and in connection with the deposition." Doc. 134-1 ¶ 16. She states her vacation time had a value of $1500, she spent over 60 hours on tasks connected to the deposition, and she reviewed emails and "many other things" to prepare. Doc. 134-1 ¶¶ 16, 17, 18. Counsel for McCarthy was not present when she requested payment. Doc. 134-1 ¶ 19.

At Swanson's deposition as corporate representative, she testified her compensation had not "been worked out as far as the final amount" because her employer would pay her during her absence, but McCarthy had agreed to pay her $4000 for "compensation for the week and for all of [her family's] expenses" before she knew her employer would pay her. Doc. 66-2 at 55–56. She said she intended to subtract the payment from her employer from the payment from McCarthy. Doc. 66-2 at 56.

### b.   Law and Analysis

"Offering financial inducements to a fact witness is extremely serious misconduct" and is "an evil that should be avoided." *Fla. Bar v. Wohl*, 842 So. 2d 811, 816 (Fla. 2003). The Florida Supreme Court has explained, "The very heart of the judicial system lies in the integrity of the participants. Justice must not be bought or sold." *Fla. Bar v. Jackson*, 490 So. 2d 935, 936 (Fla. 1986) (internal modifications omitted).

Lawyers practicing before this Court agree to be bound by the Florida Bar's professionalism rules. Local Rule 2.04(d). Florida Rule of Professional Conduct 4-3.4 states:

> A lawyer must not … offer an inducement to a witness, except a lawyer may pay a witness reasonable expenses incurred by the witness in attending or testifying at proceedings; a reasonable, noncontingent fee for professional services of an expert witness; and reasonable compensation to a witness for time spent preparing for, attending, or testifying at proceedings.

Fla. R. Prof. Conduct 4-3.4(b). In commentary to the rule, the Florida Bar explains, "[I]t is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law." Fla. R. Prof. Conduct 4-3.4 (comment). "The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to pay an expert witness a contingent fee." *Id*.

Any payment is inappropriate if it is contingent on the content of the witness's testimony or its helpfulness to the case. *See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1524–26 (S.D. Fla. 1994), *aff'd in relevant part*, 117 F.3d 1328, 1335 n.2 (11th Cir. 1997) (imposing sanctions where payments of $493,103 and $147,000 to two witnesses were contingent on testimony being truthful, material, and helpful to defense); *Ward v. Nierlich*, 99-14227 CIV, 2006 WL 5412626, at *4 (S.D. Fla. Sept. 20, 2006) (unpublished)

(imposing sanctions where plaintiff's counsel promised lump-sum payment and stake in settlement agreement for testimony).

Payments to fact witnesses for their actual expenses are permitted; payments "for the purpose of obtaining their testimony" are not. *Golden Door*, 865 F. Supp. at 1526 n.11. Rule 4-3.4(b) has been interpreted as allowing payment for tasks other than giving testimony, such as efforts to collect evidence. *See Platypus Wear, Inc. v. Hoizonte Fabricacao Distribuicao Importacao Exportacao Ltda*, No. 08-20738-CIV, 2010 WL 625356, at *4 (S.D. Fla. Feb. 17, 2010) (unpublished).

Rule 4-3.4(b) does not limit Swanson's payment to actual expenses or lost compensation but permits "reasonable compensation" for "time spent preparing for, attending, or testifying at proceedings."[15] Given Swanson's list of expenses and the hours she spent traveling to, preparing for, attending, and testifying at proceedings, the Court, while mindful of the importance of protecting the integrity of the proceedings, finds $2500 was reasonable. Her testimony does not establish that the payment was contingent on its content or usefulness, only that it had not yet been finalized at the time of the deposition. In fact, she expected to be paid an amount lower than she originally thought. *See* Doc. 66-2 at 55–56. There is no evidence the payment induced her to alter her testimony or that counsel attempted to sway her by offering a large lump sum. SSU's motion for an order to show cause, Doc. 125, is **denied** except to the extent SSU may ask her about the payments on cross examination.

---

[15]Neither party addresses whether Swanson qualifies as an occurrence witness or an expert witness as distinguished by the commentary to Rule 4-3.4. In another filing, the defendants suggest they disclosed her as a hybrid fact/expert witness. *See* Doc. 137 at 8. Without briefing from the parties on this issue, the Court analyzes her payment under the stricter standard for occurrence witnesses.

**6.** **Conclusion**

The Court:

1. **grants in part** the defendants' motion for sanctions, Doc. 157;

2. **grants in part** SSU's motion to exclude testimony from Lonnie Rudy Carroll, Jr., Doc. 93;

3. **denies** SSU's motion in limine to exclude evidence and argument on its compliance with grading tolerances, including testimony from Ryan Carstensen, Doc. 124;

4. **denies** the defendants' motion to exclude testimony from Lisa and Leslie Mosley, Doc. 142;

5. **denies** SSU's motion for an order to show cause why McCarthy should not be sanctioned, Doc. 125; and

6. **directs** the parties to confer on the expenses the defendants would not have incurred but for SSU's discovery delays.

**Ordered** in Jacksonville, Florida on February 1, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c: Counsel of Record

40